## SAGER *v.* HARTSHORN.

1. MORTGAGES—PAYMENT—BURDEN OF PROOF.
   The complainant, in a suit to determine the amount due on a mortgage held by defendant, has the burden of proving payments which he avers.

2. SAME—ACCOUNTING.
   *Held* that the weight of the testimony was strongly against complainant's claim that he had made payments which defendant omitted to indorse on the mortgage note.

Appeal from Shiawassee; Miner, J.   Submitted October 26, 1910.   (Docket No. 123.)   Decided December 7, 1910.

Bill by Charles W. Sager against Fred E. Hartshorn to determine the amount due on a certain mortgage, and to require defendant to indorse thereon certain alleged payments.   From a decree granting a part of the relief prayed for, defendant appeals.   Reversed, and decree for defendant entered.

*Odell Chapman,* for complainant.

*Albert L. Chandler* and *George E. Pardee,* for defendant.

MOORE, J.   The bill of complaint states, in substance, that complainant and his wife gave a mortgage April 21, 1899, to John Sell for $1,100 on certain real estate owned by them; that complainant has made payments thereon until the mortgage has been reduced to about $750, while the defendant, the present owner, claims there is over $1,100 unpaid.   Other statements in the bill of complaint are as follows:

"As your orator is an old man, liable to depart this life at any time, he greatly fears unless he is able to have a proper indorsement made upon said note and mortgage that he may die before the same is fully paid and all such payments as have heretofore been made by him as are not indorsed on his said note and mortgage and for which he does not hold receipts will be lost.   And your orator says there are several payments for which he does not hold receipts and which are not indorsed on said mortgage. * * * Your orator further prays   *   *   *   that the said defendant may come to an accounting and ascertainment of how much is still due upon said mortgage, and that he may, by an order of this court, be compelled to indorse on the said note and mortgage all sums of money which have either been paid to him or his predecessors in ownership of said mortgage, and that the defendant may be permitted to pay the honest and correct balance found by this honorable court to be justly due from complainant to de-

fendant, and that your said orator may have such other, farther, different, and more complete relief as to this honorable court shall be deemed just and in accordance with equity and good conscience."

The defendant answered, setting out his version of the situation. A demurrer clause was contained in the answer. A hearing was had, and the court decreed that defendant had made a payment of $85.88 on October 29, 1900, and one of $90, April 26, 1907, for which he should be credited on the note. The defendant has appealed from that decree. Complainant has not appealed.

The questions involved are questions of fact. It was an advantage doubtless for the trial court to see the witnesses, but we are bound to try the case *de novo*, having in mind the rule that, as the complainant is averring payments, the burden is upon him to show that he made them.

The record discloses that, after Mr. Sell died, Mr. Bachman, who was a relative of the Sells, had charge of his estate; that Mrs. Sell, the widow, made her home with them for a time; that the mortgage came to Mrs. Sell by reason of the will of her husband. Mrs. Sell sold the mortgage in January, 1908, to Mr. McKenzie, who about one month later sold it to defendant. The bill of complaint was filed in this case October 16, 1909.

The note accompanying the mortgage reads as follows:

"$1100.          MORRICE, MICH., April 21, 1899.
" Eleven years after date, for value received, we promise to pay to the order of John Sell, the sum of eleven hundred dollars with interest thereon at the rate of six per cent. per annum, payable annually, to wit, on the 21st day of April in each year until this note is fully paid, with the privilege of paying one hundred dollars or more at the end of each year when the interest becomes due and payable according to the tenor of a certain mortgage bearing even date herewith, executed by Charles W. and Cornelia L. Sager, to said John Sell, which mortgage is collateral hereto.
" CHARLES W. SAGER.
" CORNELIA L. SAGER."

Indorsements:

"August 14, 1899, received on the within note $50.
January 20, 1900, received on the within note, $50.   November 22, 1900, received on the within note $100.98.
November 12, 1901, received on the within note $45.
October 16, 1902, received $100.   October 2d, received,
$100, 1904; February 21, 1907, received $50.   Notice protest waived.   W. E. McKenzie.   April 4, '08, Cash $66.
Interest in full to April 21, '08.   $66 paid as interest to
April 21, '09.   $66 paid April 23, '10, interest to April 21,
1910."

Mr. Sager produced upon the trial a receipt purporting
to be signed by Hannah Sell, dated October 28, 1900, for
$85.88.    It will be observed that the note does not bear
any indorsement of a payment made that date.   It is the
testimony of Mr. Bachman that complainant made this
payment and at the same time the complainant had sold
Mr. Bachman some crates which he manufactured, the
exact amount of which they did not at that time know;
that later it was learned they amounted to $15.10, which
amount Mr. Bachman paid to Mrs. Sell, together with the
$85.88, and indorsed on the note November 22, 1900, a
payment for $100.98, which amount was made up from
$15.10 for crates and the $85.88 complainant had paid in
cash.    Mr. Bachman's testimony is very strongly corroborated by the testimony of Mrs. Dewey:

"*A.* Mrs. Sell came down to visit me in June, 1907,
and she stayed some time.   She had her papers with her.
They remained there and in the safety deposit vault in the
bank until Mr. McKenzie purchased them.

"*Q.* Did Mr. Sager come to see you with reference to
the papers?

"*A.* He came down, and I told him to bring his papers
down and we would go over them; whatever we owed
him, that he hadn't credit for, we would settle for.

"*Q.* What reply did he make to that, if you remember?

"*A.* Why, he said he had some with him, and he showed
me this $85 receipt, and I showed him on his note and recalled the circumstance about it, and he said it was the
same.

"*Q.* What payment was that, do you remember?

"*A.* It was the payment in November; it is credited in November, I think, the 22d, of $100.98.

"*Q.* Did you and he talk it over about the $85.88?

"*A.* We did, and I recalled the circumstance to him; he remembered about it; he remembered about the horse running away and his delivering the crates later."

The cross-examination of the complainant indicates the improbability of his having money to make a payment of $85.88, October 28, 1900, and a payment in excess of $100 less than a month later. There is other testimony bearing upon that payment which we will refer to later.

As to the $90 item: It is the claim of complainant that in April, 1907, he went to the house of Mr. Bachman and found Mrs. Sell alone and paid to her the sum of $100, and she agreed that when Mr. Bachman returned she would send him a receipt for the amount; that a few days later a receipt was brought to him by a little girl; that he put the receipt away and later found it was a receipt for $10, instead of for $100. In testifying about this transaction, he said, among other things:

"*Q.* What was done, if any time, as to giving or sending to you a receipt?

"*A.* A day or two afterwards, I got a receipt. A little girl brought one to the road. I was going by Mr.—Oh, well, the man that lives on Bachman's farm there, Ed. Elker, I was going by their house. A little girl comes out. She says, 'Here is a paper Mr. Bachman sent over to you.' I took it and looked at it. I had no glasses or nothing. I looked at it. I see it was a receipt.

"*Q.* Said Mr. Bachman sent it to you?

"*A.* Yes, Mr. Bachman. I looked at it. It looked as if it was $100 indorsed. I said that it was a receipt for $100, I guess. I doubled it up, and put it in my pocket. When I got home, I put it in my drawer where I keep my papers.

"*Q.* Did you have glasses with you at that time?

"*A.* No, sir; and I supposed it was $100.

"*Q.* When was the first time that you again looked at that receipt?

"*A.* A spell after that, I had a dream, I dreamed one night Mrs. Sell was cheating me out of that hundred dollars and it worried me.

"*Q.* Don't tell us what you dreamed. Tell us when was the next time you saw that receipt is what I asked you.

"*A.* That next morning I went and looked at the receipt and see what it was; I looked and I says it is only $10 instead of $100.

"*Q.* You mean the next morning after your dream?

"*A.* Yes.    *    *    *

"*Q.* Was that before or after McKenzie got the mortgage?

"*A.* No, that was after. Mr. McKenzie had the mortgage then.

"*Q.* It was after he owned it?

"*A.* Yes."

It will be remembered Mr. McKenzie bought the mortgage in January, 1908. On the cross-examination he testified that he made Mrs. Sell personally only one payment of $100, Mrs. Bachman testified that complainant came to her house when Mr. Bachman was away and paid Mrs. Sell $100, that when Mr. Bachman came home he was informed of the transaction, and Mr. Bachman testifies he sent Mr. Sager a receipt and indorsed the amount on the note, and that it is the indorsement of October 2, 1904. It is the testimony of both Mr. and Mrs. Bachman that in April, 1907, on account of her advanced age, Mrs. Sell was never left alone for more than a few minutes at a time. Mr. Bachman testified that the $10 payment was made to him by the complainant, who furnished him a piece of paper upon which he wrote a receipt for $10 and delivered it to the complainant; that it was not indorsed on the note because the note was not at that time accessible to him. Near the close of the case, the complainant, in response to his counsel, gave the following testimony:

"*Q.* What had been the relations between you and Mrs. Sell up to January, 1908? Had there been any trouble between you?

"*A.* Nothing very special. I built a house for them and a barn by the job, furnished the material for the house and built it, and then done the work on the barn for them, and they took out about $230 out of my bill; said I didn't

nail the shingles good on the roof, and so on. That was long before I borrowed the money.

"Q. Since the death of John Sell, and since you borrowed his money, has there been any difficulty between you and Mrs. Sell up to January, 1908?

"A. Not any particular, only I didn't feel very good, taking $230 out of me."

The testimony of Mr. McKenzie is that before he bought the mortgage he called complainant up by phone and asked him to call upon him and ascertain how much was unpaid; that the complainant called upon him; that neither of them had the note to see the indorsements, but Mr. McKenzie was to get them.

"If I would get those and send them, he would have the teacher figure it over for us.

"Q. What did you do then, if anything, with reference to getting the figures and sending them?

"A. I went to Mrs. Dewey and got the note, and I think I copied it myself, I am not just sure, but I think I did; if I didn't she gave them to me, * * * and I mailed him a copy of the dates.

"Q. Did you see this paper that was there?

"A. Yes, sir.

"Q. What would you think as to that being the one?

"A. That is the one. I made that out myself, and I made a copy of it, which I have somewhere in my office, but I didn't have time to find it this morning.

"Q. After you sent him that paper, how long was it before you saw him again?

"A. He came down I should think perhaps a week, I should judge. I don't just remember the exact time, but somewhere along there. It wasn't long, because I was in a hurry to get this matter closed up, and he brought the figures of the teacher and said he had figured it over, or the teacher had, and so we compared notes.

"Q. You and Mr. Sager?

"A. Yes. There was at that time * * * when I was buying the mortgage about $1,150 due, but, when I figured it over, I figured it so as to make it even years and figured it ahead to April 21st, and that is the way the statement comes there because that was the time he was going to pay the interest or about that time, so of course that is the way it figures about $1,170, but it is very

nearly $1,150. Well, when we came to figure it, he says the teacher makes it so much, told the number of figures, it was something like 10 or 15 dollars more than I had made it, and I looked the teacher's figures over.   *   *   * Almost the first item was a mistake of $10 in subtraction. That was in Mr. Sager's favor, and I called his attention to it. I said there is a mistake right there and showed him the figure; that would make his figures more than mine, and it was a mistake of $10 in his favor. I called his attention to it. I said, 'I don't want to figure this way any more than it is because I am paying for it, and I don't want to pay only what is on it, and I don't want you to pay any more.' So I said there is no use of looking over the teacher's figures farther because they would be changed all the way through; that $10 would make a big difference in the total amount anyhow. Mr. Sager spoke up when I showed him the $10, 'I think probably your figures are about correct.' He went out, and he said, 'When the interest is due, I will pay you.' I said: 'I am away a good deal. If I am not in the office, you can leave it at the bank, in the Citizens' Bank.' It ran along quite awhile, and during this time I thought I had sold the mortgage to Mr. Hartshorn before the interest was due, but I retained the interest and kept that out. I called Mr. Sager up by phone. He says, 'I left that interest at the bank.'"

Mr. McKenzie had some trouble in finding the interest, as Mr. Sager had left it for him in the wrong bank. Mr. Sager had in his possession at the trial the paper Mr. McKenzie had furnished him. It is a very significant fact that the amount Mr. Sager left at the bank to pay the interest was the sum of $66, 6 per cent. on $1,100, and that a like amount was paid by him the following year. Mr. Sager was upwards of 80 years old when he was testifying. We have already mentioned some strange things in his testimony. It is apparent he was forgetful, and we think the testimony is strongly against the theory that either of the payments were made.

The decree is reversed, with costs to defendant, and one may be entered here in accordance with this opinion.

BIRD, C. J., and OSTRANDER, HOOKER, and STONE, JJ., concurred.